ROBERTS, J.,
for the Court.
SUMMARY OF THE CASE
¶ 1. On October 10, 2005, a jury sitting before the Second Judicial District of the Jones County Circuit Court found James Fugate guilty of aggravated domestic violence. Following unsuccessful post-trial motions for JNOV or, alternatively, for new trial, Fugate appeals and raises six issues, listed verbatim:
I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO GRANT THE DEFENDANT’S MOTION TO SUPPRESS EVIDENCE OF PRIOR ABUSES ALLEGED TO HAVE BEEN COMMITTED AGAINST MS. HOWARD BY MR. FUGATE. THEREBY RESULTING IN JUROR PREJUDICE BECAUSE OF THE DEFENDANT’S ALLEGED PRIOR BAD ACTS.
II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO GRANT THE DEFENDANT’S MOTION TO DISALLOW THE STATE FROM INTRODUCING VIDEO TAPED STATEMENTS MADE BY THE DEFENDANT WHICH WERE SPECULATIVE IN NATURE AND COUCHED IN TERMS OF *607 WHAT MAY OR MIGHT HAVE HAPPENED.
III. [THE CIRCUIT] COURT ERRED BY NOT ALLOWING TESTIMONY OF KAY SMITH WHO WAS CALLED BY THE DEFENSE TO IMPEACH STATEMENTS MADE BY THE STATE’S VICTIM WITNESS.
IV. THE DISTRICT ATTORNEY IN HIS CLOSING ARGUMENTS DIRECTLY CALLED A WITNESS FOR THE DEFENDANT A LIAR. THIS WAS PLAIN ERROR THAT THE COURT SHOULD HAVE STEPPED IN AND PROTECTED THE RIGHTS OF THE DEFENDANT BY IMMEDIATELY DECLARING A MISTRIAL.
V. THE COURT COMMITTED REVERSIBLE ERROR BY FAILING TOP [SIC] GRANT THE DEFENDANT’S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF THE STATE’S CASE-IN-CHIEF, AND BY FURTHER OVERRULING THE DEFENDANT’S MOTION FOR J.N.O.V. AS THE OVERWHELMING WEIGHT AND SUFFICIENCY OF THE EVIDENCE COULD NOT POSSIBLY SUPPORT A JURY VERDICT OF GUILTY IN THIS CASE.
VI. WHETHER THE ABOVE DESCRIBED ERRORS WHEN VIEWED CUMULATIVELY RISE TO THE LEVEL OF PREVENTING MR. FUGATE FROM RECEIVING A CONSTITUTIONALLY FAIR TRIAL.
Finding no error, we affirm.
FACTS
¶ 2. As of September of 2004, James Fugate had been living with his girlfriend, Stacy Howard, for approximately a year and a half. On September 8, 2004, Fugate and Howard drank, by Howard’s description, “a lot” of alcohol. Howard and Fu-gate argued. According to the prosecution, Fugate got violent with Howard. Fugate disputed that contention. What happened the next morning, however, is entirely undisputed.
¶ 3. The next morning, Howard looked at herself in the mirror and found extremely severe injuries to her face. Alarmed by her appearance, Howard asked a friend to take her to the emergency room at South Central Regional Medical Center (SCRMC) in Laurel, Mississippi.
¶ 4. At SCRMC, Howard underwent x-rays. In laymen’s terms, those x-rays revealed multiple fractures to her face. Howard’s treating physician at SCRMC described those fractures as “a fractured zygoma,” “a blow out fracture of her orbit,” “multiple fractures of her maxillary bone,” and “a fractured mandible.” Howard also had severe swelling and “lacerations about her mouth.” Both of Howard’s eyes were black. Her right eye was so black and swollen that she could not open it. Based on the severity of her injuries, Howard was transferred to the University Medical Center (UMC) in Jackson, Mississippi.
¶ 5. Due to severe swelling, UMC physicians could not treat any of Howard’s injuries. On September 10, 2004, Howard took a Greyhound bus back to Laurel. Howard went to the Jones County Sheriffs Department and gave a sworn statement to Brad Grunig, a criminal investigator. Howard told Investigator Grunig that Fugate beat her with his fists.
¶ 6. On September 11, 2004, Howard went back to UMC. Howard underwent *608 plastic surgery and facial reconstruction. A plate was put in the right side of her face and her jaw was wired shut. Her jaw remained wired shut for six weeks.
¶ 7. On September 13, 2004, Fugate executed a waiver of rights document and gave a statement to Investigator Grunig. That interview was recorded on videotape. Fugate stated that he and Howard drank the night of the 9th and that they argued. Fugate said that Howard caused their arguments to escalate because she “bitched” and “nagged” and “started in on him.” Fugate did not specifically deny that he beat Howard. Instead, Fugate said that he did not remember beating Howard because he “blacked out” due to the volume of alcohol he consumed.
¶ 8. Further, Fugate said that, on past occasions, he and Howard argued when they drank and, occasionally, he had hit Howard. Fugate elaborated that he had never hit Howard with anything other than his fists because he preferred to “fight fair.” Fugate also explained that Howard had been similarly injured after past altercations and that she had never sought medical attention. Fugate opined that Howard would not have sought medical attention had she not been prompted by a friend. When asked whether he thought Howard got what she deserved, Fugate answered, “basically.”
PROCEDURAL HISTORY
¶ 9. On November 17, 2004, the Jones County Grand Jury returned an indictment against Fugate and charged him with aggravated domestic violence in violation of Section 97-3-7(4) of the Mississippi Code. Fugate pled not guilty.
¶ 10. Fugate filed three motions designed to prohibit the prosecution’s presentation of various forms of evidence, particularly his videotaped interview with Investigator Grunig. On August 11, 2005, Fugate filed a motion in limine and sought to exclude any reference to his having beaten Howard prior to September 8, 2004. That motion also applied to portions of Fugate’s videotaped interview. On October 5, 2005, Fugate filed a motion to suppress the video tape entirely or, alternatively, a motion in limine to exclude portions of the video tape in which Fu-gate speculated as to what “might have happened or probably happened” on September 8, 2004. Finally, on October 10, 2005, the date of trial, Fugate filed yet another motion in limine. By that particular motion, Fugate sought to prohibit mention of his prior criminal convictions.
¶ 11. On the day of trial, after voir dire but prior to opening statements, Fugate put the circuit court on notice of his three unresolved motions. Because the prosecution agreed to refrain from mentioning Fugate’s prior convictions, the circuit court did not have to rule on that motion. However, the prosecution contested Fugate’s other two motions.
¶ 12. The circuit court first addressed Fugate’s motion to exclude any mention of Fugate’s having committed violence against Howard prior to September 8— particularly those statements Fugate made during his September 13 videotaped interview. After the circuit court heard arguments on the matter, the circuit court overruled Fugate’s motion.
¶ 13. Immediately afterwards, the circuit court addressed Fugate’s motion to exclude any comments Fugate made during his taped interview that could be viewed as his speculating as to what happened on September 8. Again, after each side argued its respective position, the circuit court overruled Fugate’s motion. The prosecution proceeded with its presentation of evidence.
*609 ¶ 14. The prosecution presented three witnesses. Howard testified first. Howard testified as to her recollection of events on September 8. She testified that she and Fugate drank “a lot” that evening and that they argued. According to Howard, their argument turned violent. Howard recalled that, while standing outside their home, Fugate “hit [her] about two or three times.” At that point, she “went down [and] passed out.” Howard explained that she became unconscious. Later, Howard “[g]ot back up[,] ... went to the house [and] went to bed.” Finally, she recalled the days and the treatment that followed.
¶ 15. Next, the prosecution called, Mark A Kelly, D.O. Dr. Kelly treated Howard at the SCRMC emergency room. Dr. Kelly testified as to Howard’s severe injuries and the course of treatment she received.
¶ 16. Finally, the prosecution called Investigator Grunig. During Grunig’s testimony, the prosecution played the tape of Fugate’s September 13th interview. The prosecution rested after Investigator Gru-nig testified.
¶ 17. Fugate called three witnesses of his own centered around a defense theory based on accident. That is, Fugate presented evidence suggestive that he did not beat Howard. Rather, Fugate’s theory was that Howard sustained her injuries when she fell down the steps from their front door.
¶ 18. First, Fugate called his sister, Tracy Smith. Tracy testified that, as of September 8, 2004, she lived with her and Fugate’s mother. Tracy explained that she and her mother lived near Fugate and Howard. Fugate and Howard’s house was at the bottom of a hill, while hers was at the top of the hill.
¶ 19. According to Tracy, on September 8, she heard a “ruckus” coming from Fu-gate’s house sometime between 11:00 p.m. and midnight. Tracy asked two friends to drive her down the hill to Fugate’s house. When she arrived, she found Fugate standing at his front door. Tracy then testified:
[Howard] comes to the door and moves [Fugate] out of the way, and in not a respectful manner and tells him to move, who’s he talking to. And then I’m talking to her, and I’m still out in the car and then I’m talking to her. And she goes to come down the stairs on the porch. You have like little steps and it’s like concrete steps and then she fell when she was coming down and I jumped out of the car and ran over there and was helping her up and she was all bleeding and stuff. So I went in the trailer and I got a towel and I started wiping the blood from her. I told Stacy we need to take you to the hospital. We need to take you to the hospital. No, Tracy, I’m too drunk. I don’t need to go to the hospital right now. She’s bleeding from out of her nose, I mean just on her eyes and everything else.
So she wouldn’t go to the hospital. I tried to get her to go the next morning. And she would not go to the hospital. ¶ 20. Fugate then called Misty Allen,
one of the two friends that went to Fu-gate’s house with Tracy. Allen corroborated Tracy’s version of events, except Allen did not remember anyone being with her but Tracy. Allen also testified that she could not remember how Howard fell down the steps.
¶ 21. Finally, Fugate called his mother, Lavita Smith. Fugate’s attorney attempted to have Lavita testify that Howard did not remember the events of September 8. When Lavita began to answer, the prosecution objected and argued that Fugate’s *610 attorney had not laid the proper predicate for such impeachment testimony. The circuit court sustained the prosecution’s objection.
¶ 22. Fugate then proffered testimony from Lavita. According to Lavita, at Fu-gate’s attorney’s office, she heard Howard tell Fugate’s attorney that she did not remember what happened on September 8th because she was too drunk. Fugate then rested. After deliberation, the jury found Fugate guilty.
¶ 23. On November 8, 2005, the circuit court sentenced Fugate to twenty years in the custody of the MDOC with five years suspended and fifteen years to serve. That same day, Fugate filed a motion for JNOV or, alternatively, for a new trial. On November 21, 2005, the circuit court conducted a hearing on Fugate’s post-trial motions. Ultimately, the circuit court overruled them. Aggrieved, Fugate appeals.
ANALYSIS
I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO GRANT THE DEFENDANT’S MOTION TO SUPPRESS EVIDENCE OF PRIOR ABUSES ALLEGED TO HAVE BEEN COMMITTED AGAINST MS. HOWARD BY MR. FUGATE. THEREBY RESULTING IN JUROR PREJUDICE BECAUSE OF THE DEFENDANT’S ALLEGED PRIOR BAD ACTS.
¶ 24. Fugate appeals the circuit court’s decision to overrule his motion to suppress statements Fugate made during his taped interview regarding evidence of prior domestic violence against Howard. According to Fugate, it was inadmissible evidence of prior bad acts. The State submits that the evidence was admissible as evidence of Fugate’s motive, intent, and lack of accident.
¶ 25. We review a circuit court’s decision to admit or exclude evidence pursuant to our familiar abuse of discretion standard. Burton v. State, 875 So.2d 1120(¶ 6) (Miss.Ct.App.2004). We will find an abuse of discretion where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense. Id. We will not disturb the circuit court’s decision unless it is clearly wrong. Id.
¶ 26. Fugate asserts that his having committed domestic violence against Howard on prior occasions was inadmissible evidence of his character.
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
M.R.E. 404(b).
According to the State, Fugate’s statements in which he alluded to prior domestic violence were admissible to show absence of accident. We agree.
¶ 27. Fugate presented a defense based on accident. That is, Fugate submitted that Howard injured herself when she fell and her face hit the ground. Fugate presented two witnesses who each testified that Howard fell and that she injured herself as a result of her fall. M.R.E. 404(b) permits introduction of prior acts to demonstrate absence of accident. The evidence at issue was not so much evidence of Fugate’s violent character as it was evidence in contrast to his accident defense.
¶ 28. We must now consider M.R.E. 403. Rule 403 requires the consideration *611 of whether the probative value of proposed evidence is substantially outweighed by the danger of unfair prejudice. Marbra v. State, 904 So.2d 1169(¶ 22) (Miss.Ct.App. 2004). In this sense Rule 403 is the ultimate filter through which all otherwise admissible evidence must pass. Id.
¶ 29. Naturally, the evidence is prejudicial to Fugate. It would have little prose-cutorial value if it were not prejudicial to some degree. The relevant question is whether the circuit court abused its discretion when it found that the evidence in question was more prejudicial than it was probative. Here, we cannot find that the circuit court abused its discretion.
II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO GRANT THE DEFENDANT’S MOTION TO DISALLOW THE STATE FROM INTRODUCING VIDEO TAPED STATEMENTS MADE BY THE DEFENDANT WHICH WERE SPECULATIVE IN NATURE AND COUCHED IN TERMS OF WHAT MAY OR MIGHT HAVE HAPPENED.
¶ 30. Fugate takes the position that the circuit court improperly allowed the prosecution to present inadmissible opinion evidence contained in his videotaped interview. That is, Fugate claims the prosecution should not have been permitted to present his statements as to how Howard sustained her injuries on September 8 if he did not cause them. We stated our standard of review in Fugate’s first assignment of error. There is no reason to repeat it here.
¶ 31. Fugate invokes M.R.E. 701 as his rationale for exclusion of the evidence at issue. Pursuant to M.R.E. 701:
If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perceptions of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
¶ 32. Fugate does not point to one specific point or statement within his videotaped interview that he claims is inadmissible under M.R.E. 701. We can only assume that Fugate references the portion of his interview in which Investigator Grunig asks Fugate what he thought happened to Howard if he did not beat her up. Fugate pointed out that he did not remember much of the evening because he “blacked out.” However, he speculated that Howard “went out and got herself beat up.”
¶ 33. Fugate does not point out just how the statements at issue, whatever nonspecific statements he references, are either (a) not rationally based on his perceptions, (b) unhelpful to either the clear understanding of his statement or the determination of a fact in issue, or (c) that they are based on scientific, technical, or other specialized knowledge within the scope of M.R.E. 702. Fugate’s responses as to the events of September 8 obviously did not call for an answer based on some scientific or other specialized knowledge. Fugate’s statement was obviously rationally based on his perceptions. He was asked what happened to Howard on September 8. Naturally, that question called for an answer based on Fugate’s perception of that night.
¶ 34. Fugate essentially answered that he did not know because he “blacked out” as a result of the volume of alcohol he consumed. If Fugate did not cause Howard’s injuries, as he claimed, and no one *612 else could have subjected Howard to such injuries, the next obvious inquiry is to ask just how Howard ended up injured. In that sense, Fugate’s responses were helpful to the clear understanding of his statement and they were helpful to the determination of the fact in issue — whether Fugate caused Howard’s injuries.
III. [THE CIRCUIT] COURT ERRED BY NOT ALLOWING TESTIMONY OF KAY SMITH WHO WAS CALLED BY THE DEFENSE TO IMPEACH STATEMENTS MADE BY THE STATE’S VICTIM WITNESS.
¶ 35. In this issue, Fugate claims the circuit court improperly prohibited him from impeaching Howard’s testimony with Lavita Smith’s testimony. The standard of review stated in issues one and two apply here as well. Suffice it to say, we review this issue for an abuse of discretion.
¶ 36. During cross-examination of Howard, the following exchange took place:
Q. Ms. Howard, I’m David Ratcliff. I represent James Fugate. Have you ever met me before?
A. Yes, sir.
Q. How many times?
A. Once.
Q. Where was it?
A. In your office.
Q. In my office when approximately?
A. I’m not sure.
Q. A month or two ago?
A. Yeah, I’d say.
Q. What did you tell me happened to you that time at my office?
[Objection by the Prosecution. Bench conference not reported].
Q. What did you tell me about what happened on September 8th to you, September 8th of 2004?
A. I told you I didn’t remember a whole lot about it.
Q. You didn’t remember [Fugate] hitting you, isn’t that what you told me?
A. No, sir.
Q. What did you tell me?
A. I just told you.
Q. You’re saying that the entire extent of our conversation or your statement to me was that you didn’t remember a whole lot about it.
A. Yes, sir.
Q. Is that what you’re saying?
A. Yes, sir.
Q. And that’s all you said?
A. Yes, sir.
Fugate’s attorney then moved to another subject.
¶ 37. During direct examination of La-vita Smith, Fugate’s attorney attempted to impeach Howard’s testimony. Counsel for Fugate asked Lavita whether she remembered being at his office at the same time as Howard. Lavita testified that she did. When Fugate’s attorney asked Lavita what Howard said, the prosecution objected and argued that Fugate’s attorney had not laid a proper predicate for such impeachment testimony. The circuit court sustained the prosecution’s objection.
¶ 38. Fugate’s attorney then asked La-vita, “Has Stacy Howard ever told you anything about what happened directly other than in my office?” The prosecution objected again, based on the lack of a proper predicate, but not before Lavita answered, “Basically that she doesn’t remember.”
¶ 39. The circuit court had the jury removed from the courtroom. The prosecution argued that Fugate’s attorney did not lay a proper predicate for the question during Howard’s testimony. The circuit *613 court sustained the prosecution’s objection. Accordingly, Fugate proffered the following testimony from Lavita:
Q. Do you recall being in my office?
A. Yes, sir.
Q. All right. And did you recall me asking Stacy Howard what happened on September 8th, the evening of September 8th—
A. Yes, I do.
Q. —at James Fugate’s trailer?
A. Yes, sir.
Q. Do you recall that? What did she say?
A. She said that she didn’t really remember. That she was drunk. She said that she did not want anything to happen to [Fugate], but that she really wasn’t sure what happened. She didn’t want to come to court.
Q. All right. That was the extent of her testimony at that time? I mean, her statement at that time.
A. Yes, sir.
¶ 40. Fugate claims the circuit court erred when it did not allow him to present Lavita’s testimony of Howard’s recollection. Fugate submits that unsworn prior inconsistent statements may be used to impeach a witness’s credibility. According to Fugate, Howard testified that she did not tell Fugate’s attorney that she did not remember that Fugate hit her. Fugate reasons that Lavita’s testimony was admissible as a prior inconsistent statement and that he laid a proper predicate for the question.
¶ 41. Fugate attempted to have Lavita testify as to what he termed prior inconsistent hearsay statements made by Howard. There is no question that Howard’s testimony would not be admissible as a prior inconsistent statement pursuant to M.R.E. 801(d)(1). Howard did not testify, inconsistently or otherwise, under oath at a prior hearing, deposition, or other proceeding. Finally, Howard’s prior statement was not “one of identification of a person made after perceiving him.”
¶ 42. A witness’s prior statements may also be admissible pursuant to M.R.E. 613. Rule 613(b) states:
Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.
We cannot find that the circuit court abused its discretion in sustaining the prosecution’s objections. On cross-examination, Howard testified that she did not remember much about the evening of September 8. According to Lavita’s proffered testimony, Howard told Fugate’s attorney that “she didn’t really remember” the events of September 8 and that Howard “really wasn’t sure what happened.” Howard’s testimony that she did not remember much about the evening of September 8th is not inconsistent from Lavi-ta’s proffered testimony that, according to Howard, she did not “really remember” the events of that evening. Accordingly, Lavita’s proffered testimony was consistent with Howard’s testimony and, as such, Lavita’s proffered testimony would certainly not be admissible as prior inconsistent testimony.
IV. THE DISTRICT ATTORNEY IN HIS CLOSING ARGUMENTS DIRECTLY CALLED A WITNESS FOR THE DEFENDANT A LIAR. THIS WAS PLAIN ERROR THAT THE COURT SHOULD HAVE STEPPED IN AND PROTECTED THE RIGHTS OF THE DEFENDANT *614 BY IMMEDIATELY DECLARING A MISTRIAL.
¶ 43. Here, Fugate claims the prosecutor made improper comments during closing arguments. Fugate references the prosecutor’s description of Tracy Smith’s testimony as “lies.” Fugate failed to object at trial. Consequently, the procedural bar operates, and this issue is deemed waived. Gary v. State, 796 So.2d 1054, 1056 (Miss.Ct.App.2001).
¶ 44. However, Fugate also argues that the circuit court committed plain error because it “should have stepped in and protected [his] rights ... by immediately declaring a mistrial.” Fugate cites no relevant law indicating that a circuit court commits plain error when it does not spontaneously declare a mistrial when the prosecutor points out inconsistencies in testimony from a defendant’s witnesses. For that reason, Fugate’s argument is further barred.
¶ 45. Assuming, for the sake of argument, that this issue were not doubly barred, this issue would still be meritless. An argument is proper argument if it stems from “deductions and conclusions that could reasonably flow from the facts and evidence.” Sanders v. State, 801 So.2d 694(¶ 39) (Miss.2001).
¶ 46. During the prosecution’s rebuttal to Fugate’s closing argument, the prosecutor pointed out that Tracy claimed that she saw Howard fall down in an effort to show that Fugate did not beat Howard. The prosecutor then attempted to demonstrate inconsistencies in Tracy’s testimony by showing (a) Tracy paid for Fugate’s bond, picked him up at the jail, lived with Fugate at their mother’s home, yet claimed they did not discuss the case, and (b) Tracy never gave a statement to authorities, despite her brother being arrested and charged with aggravated domestic violence. The prosecution was merely pointing out inconsistencies between Tracy’s testimony and her behavior.
Y. THE COURT COMMITTED REVERSIBLE ERROR BY FAILING TOP [SIC] GRANT THE DEFENDANT’S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF THE STATE’S CASE-IN-CHIEF, AND BY FURTHER OVERRULING THE DEFENDANT’S MOTION FOR J.N.O.V. AS THE OVERWHELMING WEIGHT AND SUFFICIENCY OF THE EVIDENCE COULD NOT POSSIBLY SUPPORT A JURY VERDICT OF GUILTY IN THIS CASE.
¶ 47. Fugate attacks both the weight and the sufficiency of the evidence. A motion for a JNOV, as well as a motion for a directed verdict and request for a peremptory instruction, challenges the legal sufficiency of the evidence. Griffin v. State, 883 So.2d 1201(¶6) (Miss.Ct.App.2004). We will only reverse if the evidence of one or more of the elements of the charged offense is such that, considered in the light most favorable to the prosecution, reasonable and fairminded jurors could only find the accused not guilty. Id. A motion for a new trial, however, is an attempt to vacate the judgment on grounds related to the weight of the evidence. Id. at (¶ 8). We will reverse a circuit court’s decision to overrule a motion for new trial only if the circuit court abused its discretion. Id.
¶ 48. Howard testified that Fugate struck her at least two or three times and that she “went down [and] passed out.” Howard testified that she found herself seriously injured the next morning. Dr. Kelly testified as to Howard’s multiple facial fractures. The jury heard ample evidence to find Fugate guilty. Likewise, we do not find that the circuit court abused its *615 discretion when it overruled Fugate’s motion for a new trial.
VI. WHETHER THE ABOVE DESCRIBED ERRORS WHEN VIEWED CUMULATIVELY RISE TO THE LEVEL OF PREVENTING MR. FUGATE FROM RECEIVING A CONSTITUTIONALLY FAIR TRIAL.
¶49. Fugate claims the cumulative effect of the errors made it impossible for him to receive a fair trial. We can find no error whatsoever, much less some cumulative effect that would render Fugate’s trial impossible unfair.
¶ 50. THE JUDGMENT OF THE JONES COUNTY CIRCUIT COURT OF CONVICTION OF AGGRAVATED DOMESTIC BATTERY AND SENTENCE OF TWENTY YEARS WITH FIVE YEARS SUSPENDED AND FIFTEEN YEARS TO SERVE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.