# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01099-COA

**TERRANCE McNAUGHTON A/K/A TERRANCE SIERRA McNAUGHTON A/K/A FRED**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/01/2023 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/04/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. Terrance McNaughton drove over his ex-girlfriend, Nina Cumbest, in a gas station parking lot, causing severe and ultimately fatal injuries. Following a jury trial, McNaughton was convicted of second-degree murder and sentenced to serve forty years in the custody of the Department of Corrections. On appeal, McNaughton argues that the trial court abused its discretion by admitting evidence of prior incidents of domestic abuse, that there is insufficient evidence to support his conviction, and that the jury's verdict is contrary to the overwhelming weight of the evidence. We find no error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. On April 28, 2021, a justice court judge entered an ex parte domestic abuse protection order that prohibited McNaughton from contacting his ex-girlfriend, Nina Cumbest, by phone or otherwise and from going within 1,000 feet of Nina or her place of employment. However, in the early morning hours of May 6, 2021, McNaughton repeatedly attempted to call Nina while she was bartending at the Sidelines Sports Bar and Grill in Gautier. Nina would not answer her phone, and a customer at the bar, Curtis Ryan, asked her why her phone "kept lighting up" and "what was going on." Nina "said it was [McNaughton] steady calling her." Curtis knew that McNaughton had assaulted Nina previously, and he decided to answer Nina's phone the next time McNaughton called. Curtis told McNaughton that "if he wanted to beat on somebody," he should "come on up there" and fight Curtis. McNaughton and Curtis eventually agreed to meet and fight "one on one."

¶3. McNaughton was at another bar with Calvin Butler at the time. Although Curtis and McNaughton had agreed to fight "one on one," Butler went with McNaughton to meet Curtis. Butler also asked his brother (Lathan Seales) to join them because he "had a bad feeling" that "things [could] get ugly." McNaughton parked his pickup truck at The Shed, a restaurant on the opposite side of Highway 57 from a Chevron gas station just south of Sidelines. McNaughton called Curtis and then got out of his truck and walked across the highway to the Chevron. Curtis left Sidelines and began walking toward the Chevron.

¶4. Nina, her brother Tyler, Curtis's brother Roy, and other customers from Sidelines—including Joseph "Shrimp" Shelton, Douglas Feeley, and Johnathan Jordan—also

went to the Chevron. Nina parked her car near a gas pump and got out holding a small souvenir baseball bat. Her brother Tyler was nearby holding a full-size baseball bat.

¶5.    There were initial scattered skirmishes or arguments between different parties in and around the Chevron parking lot. Butler and Curtis began fighting just before Curtis reached the Chevron. Nearby, McNaughton and Nina approached one another and argued but did not engage in a physical altercation. Shelton heard McNaughton screaming at Nina, "F*** you, bitch; I'm going to kill you, bitch . . . ." McNaughton then ran across the highway, got in his truck, and drove back into the Chevron parking lot directly toward Nina. McNaughton's truck struck Nina and ran over her with both driver's side tires before speeding off. Surveillance video showing some of the arguing and fighting and the fatal collision in the Chevron parking lot was admitted into evidence and played for the jury at trial. A few minutes after leaving the Chevron parking lot, McNaughton's truck collided with an eighteen-wheeler.

¶6.    Nina and McNaughton were both transported to a local hospital where they were treated and then transferred to the University of South Alabama Hospital. McNaughton recovered, but Nina died six months later as a result of injuries she sustained in the collision at the gas station. A grand jury indicted McNaughton for second-degree murder. A jury trial was held in the Jackson County Circuit Court in May 2023.

¶7.    Curtis testified that although Nina was carrying a small souvenir baseball bat, she did not hit anyone with the bat and "was trying to break . . . up" the fight and "stop all [the] fighting." Curtis, Roy, and Shelton all testified that no one attacked McNaughton. After

3

McNaughton ran back to his truck, Curtis "heard tires on gravel spinning out. And the next thing [he] knew, [he] turned around and Nina was laying in the parking lot." Curtis did not see McNaughton's truck strike Nina because he was trying to fight off Butler and had his back turned to Nina at the moment of impact. However, he testified that McNaughton "was spinning tires" as he drove toward Nina, never hit his brakes or slowed down, and then drove away. Nina was motionless and unresponsive on the ground, and Curtis believed "she was going to die or [already] dead." McNaughton's truck hit Nina so hard that her pants were knocked down around her ankles. Curtis left Nina to help his brother Roy fight off another attacker. Curtis testified that the fighting ended when a car came out of The Shed parking lot and picked up Butler and the other men who were fighting alongside him.[1]

¶8.     Shelton similarly testified that after McNaughton ran back to his truck, he heard McNaughton's "tires spinning . . . in [the] gravel parking lot" at The Shed, and the truck then sped across the highway toward Nina. Shelton testified that the truck never slowed down and continued on after it struck Nina. Shelton was carrying a pistol but did not draw the weapon until after Nina was struck. Shelton testified that after the collision, he drew his pistol and pointed it at Butler because he knew Butler "wasn't friendly." However, he holstered the pistol after he determined that Butler was not a threat. Nina was on the ground, motionless and unresponsive. At least one of her legs was obviously broken, "[h]er eyes were rolling into the back of her head and twitching," and her pants had been knocked down around her ankles. Shelton called 911.

---

[1] Curtis and Roy both testified that one or two other men were with McNaughton, Butler, and Seales.

4

¶9.    Roy testified that he heard McNaughton tell Nina that "he would make sure he finished the job this time and kill[] her." Roy heard McNaughton's tires spinning in the gravel across the highway in The Shed's parking lot before McNaughton drove across the highway and struck Nina. On cross-examination, Roy denied that Nina moved or ran into the path of the truck. Instead, on redirect, Roy testified that McNaughton's truck *turned into Nina* prior to impact. Roy testified that McNaughton could have turned right or left onto the highway but, instead, drove directly toward Nina.

¶10.    Justin Grafton, the chief investigator with the district attorney's office, measured the driveway entrance of the Chevron. He testified that the driveway was wide enough for two vehicles to drive side by side. Grafton then used drone footage to show the jury "the path that [McNaughton's] truck took as it passed through the parking lot." When asked what options McNaughton had to leave the scene, Grafton stated that McNaughton "could have turned" "either way" onto the highway "or drove through the parking lot on the correct side of the drive."

¶11.    Dr. Drew Weber was working in the emergency room at Singing River Hospital when Nina arrived by ambulance. Nina had a crushed pelvis, a skull fracture, subdural hematomas, a femur fracture, and tibial fractures. Because Nina had severe neurological injuries, Weber transferred her to the University of South Alabama to be monitored by a neurosurgeon. At the time, Weber "didn't have high hopes that [Nina] would have a great recovery." Weber also treated McNaughton for severe injuries he sustained when his truck collided with the eighteen-wheeler. Weber testified that McNaughton was combative, uncooperative, and

5

"appeared heavily intoxicated." McNaughton was also transferred to the University of South Alabama, where he recovered.

¶12.     Dr. Staci Turner, the state medical examiner, performed Nina's autopsy and testified at trial as an expert in forensic pathology. Turner testified that Nina's "cause of death" was "complications of blunt force injuries."

¶13.     After the State rested its case-in-chief, Feeley was called as a defense witness. He testified that after "a tussle broke out" near the Chevron, he saw McNaughton "running back across the road." McNaughton "jumped in the truck and threw it in reverse, and he then threw it in drive, and he [went] across" the highway. Feeley testified that Nina "was turning around to say[] something . . . to Tyler, with both her hands up," and "when she turned, the headlight of [McNaughton's] truck hit her in the face, and then both driver side tires ran over her." Just before Nina was hit, Feeley threw his pocketknife at the truck, "hoping that it would have made [McNaughton] go off track," "but it didn't."

¶14.     Butler testified that after McNaughton and Curtis agreed to fight, he (Butler) sent a text message to his brother (Seales) to meet them because he "had a bad feeling" that "things [might] get ugly." After arriving at the Chevron, Butler saw Nina and "[m]ultiple" other people arriving from Sidelines. Butler testified that some of the group from Sidelines started "running for [McNaughton] and attacking him." Butler testified that others "surrounded" him, and he was "nervous and scared" because one man had a crowbar and another man had a knife. Butler stated that he "threw the first punch" after he was surrounded. Butler testified that McNaughton ran back to his truck after they were attacked, and some of the

6

people from Sidelines chased after him. Butler stated that when McNaughton drove back to the Chevron parking lot, "Nina ran towards the vehicle," and then he "seen her run into the vehicle." Butler testified that McNaughton stopped and yelled at him to "get in the truck," but he did not do so because he knew that Nina was hurt and needed help. Butler claimed that he "yelled for somebody to get help," but instead the group from Sidelines "continued to attack [him]." Eventually, Seales's car pulled up, Butler got in the car, and they drove away. A "buddy" of Seales, who Butler "didn't [know] at all," was driving the car.

¶15. On cross-examination, Butler acknowledged that he talked with law enforcement twice in the days following the incident and later spoke to the district attorney's office as well. Butler admitted that he never told law enforcement or the district attorney's office that McNaughton had been attacked in the Chevron parking lot. Butler acknowledged that the surveillance video from the Chevron did not show McNaughton being attacked and that his testimony at trial was "the first time" he had said that McNaughton had been attacked.

¶16. McNaughton elected not to testify. The jury convicted him of second-degree murder. After the jury could not unanimously agree on a sentence of life imprisonment, the court sentenced McNaughton to serve forty years in the custody of the Department of Corrections. *See* Miss. Code Ann. § 97-3-21(1)(b) (Rev. 2020). McNaughton filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

¶17. On appeal, McNaughton argues that (1) the trial court abused its discretion by admitting evidence of prior incidents of domestic violence under Mississippi Rule of

Evidence 404(b), (2) the evidence was insufficient to support his conviction for second-degree murder, and (3) the jury's verdict was contrary to the weight of the evidence.

### I. Prior Incidents of Domestic Violence

¶18. Prior to trial, the State filed a motion to allow testimony about two prior domestic abuse incidents involving McNaughton and Nina. Specifically, on October 31, 2020, Nina reported to Officer Devin Seymour of the Gautier Police Department that McNaughton had slapped her, grabbed her around her throat, and put a pillow over her face to the point that she could not breathe and lost consciousness. McNaughton also took Nina's phone, but Nina was able to escape and get a ride to the police department. Nina was frightened and trembling when she reported the abuse. Officer Seymour observed her injuries, including bruising near her right eye, on her neck, and near her collarbone. In addition, on April 24, 2021, Nina called the Jackson County Sheriff's Department and reported that McNaughton had rammed his truck into her car on Highway 57, causing her car to go into a ditch. McNaughton then approached her car, demanded money, and punched her in the face several times. As a result of that incident, Nina obtained a domestic abuse protection order that was still in effect at the time of the events at issue in this case.

¶19. The State argued that evidence of these two prior incidents was admissible under Rule 404(b) to show motive, intent, absence of mistake or accident, and an escalating pattern of violence by McNaughton against Nina. In response, McNaughton argued that the evidence was irrelevant because he was charged with second-degree (depraved-heart) murder, not a "specific intent" crime. He also argued that the evidence was unduly and unfairly prejudicial

8

because he had not been convicted of any crime as a result of the prior incidents. Prior to trial, the court granted the State's motion to allow the evidence under Rule 404(b). The court found that the evidence was relevant and probative, inter alia, as to McNaughton's intent and motive and "to tell the jury a complete coherent story." The court also found that the evidence's probative value "outweigh[ed] any potential unfair prejudicial effect."

¶20.    At trial, Officer Seymour's testimony regarding the October 31, 2020 incident was consistent with the State's pretrial proffer.

¶21.    Lance Johnson testified that on April 24, 2021, he "heard a vehicle hit another vehicle" outside his home. Johnson then saw a truck pull into the ditch beside a car, "[a]nd the guy got out and started beating on the car. And he said . . . , 'I'm going to f***ing kill you, bitch, I'm going to kill you.'" Next, the man "started beating on [the woman] through the window." Johnson walked toward the vehicles before the man "told [the woman] he was going to kill her one more time, and then . . . [the man] got in his truck" and left. Johnson testified that the woman was injured, had obviously "been beat on upside the head," and "was scared" and "crying." Johnson testified that he did not know Nina, Tyler, or McNaughton prior to the incident.

¶22.    Tyler testified that on April 24, 2021, he was on the phone with Nina and could hear McNaughton "screaming," "I'm going to f***ing kill you." Tyler testified that McNaughton repeated the statement three or four times. He also heard McNaughton strike Nina "[a]t least five" times. Once Tyler arrived at Nina's location, he noted that "[h]er lips were bleeding," "[h]er eye was black," and "she had a couple of marks on her face." As a result of the

incident, Nina obtained a domestic abuse protection order against McNaughton. Afterward, Tyler "followed [Nina] everywhere she went" to ensure she was safe.

¶23. Jackson County Deputy Sheriff Carl Burns testified that on April 24, 2021, he responded to a call about the assault. Nina was "crying" and "obviously afraid." Her face was bruised and red, and she told Burns that McNaughton had hit her in the face. Nina told Burns that McNaughton "crashed into her vehicle . . . and forced them off the road." Burns then arrested McNaughton for domestic violence.

¶24. On appeal, McNaughton argues that "this extraneous evidence of alleged prior domestic violence was irrelevant," and it "turned a second-degree murder trial into a trial for uncharged domestic abuse." Further, McNaughton claims "[t]he jury was inflamed and likely felt obliged to convict McNaughton . . . ."[2]

¶25. "We review a circuit court's decision to admit or exclude evidence pursuant to our familiar abuse of discretion standard." *Fugate v. State*, 951 So. 2d 604, 610 (¶25) (Miss. Ct. App. 2007). "We will find an abuse of discretion where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense." *Id.* But "[w]e will not disturb the circuit court's decision unless it is clearly wrong." *Id.* As our Supreme Court has stated, the "trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." *Bowman v. State*, 283 So. 3d 154, 164 (¶37) (Miss. 2019) (quoting *Hargett v. State*, 62 So. 3d 950, 952 (¶7) (Miss. 2011)).

---

[2] Though it is not an issue on appeal, McNaughton also introduced evidence of an incident in March 2021 where Nina was arrested for public intoxication and disorderly conduct. A police officer was called to a bar after Nina allegedly "yelled" at McNaughton, "mushed his face," and then refused to leave the bar.

¶26.   Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1). However, such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). Such evidence may be admissible for other purposes as well—the examples listed in the rule "are not exclusive." *Id.* advisory committee note. "Evidence offered for a valid, non-character purpose 'is properly admissible if it passes muster under [Mississippi Rule of Evidence] 403 and is accompanied by a proper limiting instruction.'" *Wallace v. State*, 369 So. 3d 83, 89 (¶18) (Miss. Ct. App. 2023) (quoting *Fairley v. State*, 275 So. 3d 1012, 1019 (¶30) (Miss. 2019)). "[R]elevant evidence should not be excluded under Rule 403 unless its probative value is *substantially outweighed* by the danger of unfair prejudice." *Id.* at (¶19) (quotation marks omitted) (quoting MRE 403).

¶27.   In addition, "evidence of other acts is 'admissible in order to tell the complete story so as not to confuse the jury.'" *Id.* at (¶20) (quoting *Palmer v. State*, 939 So. 2d 792, 795 (¶9) (Miss. 2006)). "The State has a legitimate interest in telling a rational and coherent story of what happened." *Id.* (brackets and ellipsis omitted) (quoting *Bowman*, 283 So. 3d at 165 n.8). This Court has held that prior instances of domestic abuse may be admissible "to show the escalating level of violence, culminating in the crime of the murder." *Moss v. State*, 727 So. 2d 720, 725 (¶19) (Miss. Ct. App. 1998); *accord Marbra v. State*, 904 So. 2d 1169, 1175 (¶21) (Miss. Ct. App. 2004); *Wallace*, 369 So. 3d at 90 (¶21). In some cases involving

11

repeated acts of domestic violence, "testimony regarding prior acts of violence is admissible 'not to prove the character of the defendant but rather to show a continuing pattern of violence against the victim that resulted in her death.'" *Wallace*, 369 So. 3d at 90 (¶21) (brackets and ellipsis omitted) (quoting *Moss*, 727 So. 2d at 725 (¶19)). "Such evidence is relevant and admissible under Rule 404(b) to show the defendant's motive and intent." *Id.* (quotation marks omitted).

¶28. Here, the trial court found that the evidence of McNaughton's prior acts of domestic violence was admissible under Rule 404(b)(2) to show his motive and intent and to tell the jury a coherent story. The evidence that McNaughton had previously assaulted Nina at least twice and told her that he would kill her was evidence of an "escalating" and "continuing pattern of violence" against Nina. The trial court did not abuse its discretion by admitting the evidence of prior instances of domestic abuse for this purpose.

¶29. The trial court also weighed the probative value of the evidence against the potential for unfair prejudice pursuant to Rule 403. We cannot say that the trial court abused its discretion by finding that the probative value of the evidence outweighed any potential for unfair prejudice. Indeed, as noted above, it was only necessary for the court to find that the probative value of the evidence was not "substantially outweighed by a danger of . . . unfair prejudice." MRE 403. The trial court gave the jury a limiting instruction concerning the purpose of the evidence, which instructed the jury that any prior acts by McNaughton were not to be considered as evidence of his guilt of the crime charged in this case. Therefore, on the facts of this case, we conclude that the trial court did not abuse its discretion by admitting

12

evidence of prior incidents of domestic abuse.

## II. Sufficiency of the Evidence

¶30. McNaughton argues that the evidence is insufficient to prove beyond a reasonable doubt that he committed the crime of second-degree murder. In particular, he contends that "[i]t was not foreseeable, from McNaughton's point of view, that Nina would intentionally place herself clearly in the path of his oncoming vehicle." He goes on to allege that "[t]he imminently dangerous act here was performed by Nina, not McNaughton."

¶31. When we "review[] the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved its case." *Carson v. State*, 341 So. 3d 995, 1000 (¶9) (Miss. Ct. App. 2022).

¶32. To prove second-degree murder, the State was required to show that McNaughton killed Nina without the authority of law "in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect [Nina's] death." Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2020). "The Supreme Court has described conduct 'evincing a depraved heart' as 'grave recklessness manifesting utter disregard or indifference to a resultant creation of eminent

13

danger to human life.'" *McCarty v. State*, 247 So. 3d 260, 269 (¶27) (Miss. Ct. App. 2017) (brackets omitted) (quoting *Windham v. State*, 602 So. 2d 798, 802 (Miss. 1992)). "[Second-degree] murder encompasses a reckless and eminently dangerous act directed toward a single individual, from which malice is implied." *Id.* (quotation marks omitted) (quoting *Holliman v. State*, 178 So. 3d 689, 698-99 (¶20) (Miss. 2015)).

¶33. Here, Shelton and Roy both testified that McNaughton told Nina he was going to kill her just before he crossed the highway and went back to his truck. McNaughton then got back in his truck, drove out of the parking lot of The Shed, "spinning gravel," and sped across the highway toward Nina. Multiple witnesses testified that McNaughton's truck never slowed as it struck and ran over Nina and then left the scene. Roy testified that the truck turned into Nina prior to the impact. Most important, the jurors were able to view the video of the collision and make their own determinations regarding what it showed. Although Nina walked toward the entrance to the Chevron parking lot before McNaughton's truck entered the lot, the video shows that McNaughton's truck then veered left *into Nina* prior to impact. As multiple witnesses described, the truck never slowed down. There was sufficient evidence for the jury to find that McNaughton actually turned his truck toward Nina despite having ample room and opportunity to avoid her. This evidence was sufficient for "rational jurors" to convict McNaughton of second-degree murder. Therefore, the trial court did not err by denying McNaughton's motion for a judgment notwithstanding the verdict.

### III.    Weight of the Evidence

¶34. McNaughton also argues that the jury's verdict was contrary to the overwhelming

weight of the evidence. Again, McNaughton argues that Nina caused her own death by running recklessly into the path of his truck.

¶35. For challenges to the weight of the evidence, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not reassess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* In addition, we "review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Id.* at 292 (¶21).

¶36. The jury properly resolved any conflicts in the evidence. We cannot say that the jury's verdict was contrary to the overwhelming weight of the evidence. Therefore, the trial court did not abuse its discretion by denying McNaughton's motion for a new trial.

## CONCLUSION

¶37. The trial court did not abuse its discretion by admitting evidence of prior domestic assaults that McNaughton perpetrated against Nina. In addition, there is sufficient evidence to support McNaughton's conviction, and the jury's verdict is not contrary to the overwhelming weight of the evidence.

¶38. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

15