FAIR, J.,
for the Court:
¶ 1. Stanley Cole was indicted for the murder of Latasha Norman in January 2008. He was tried in the Hinds County Circuit Court, convicted of murder, and sentenced to life imprisonment. He appeals his conviction asserting eleven errors. Finding that the trial court failed to properly instruct the jury on the law of manslaughter, we reverse Cole’s conviction and remand this case for a new trial.
FACTS
¶ 2. Cole and Norman were students at Jackson State University (JSU). They were involved in an on-again, off-again romantic relationship for some years. In the fall of 2007, Cole and Norman were out with another couple when an argument escalated into a physical altercation. Norman reported this incident to campus police.
¶ 3. On November 13, Norman did not return from her afternoon class. The next day she was reported missing by her then-current boyfriend, Marquis Smith. Over the next several weeks, JSU police, Jackson police, and the FBI conducted an extensive search for Norman. Cole and his then-current girlfriend, Samone Harris, were interviewed but stated they knew nothing of Norman’s disappearance.
¶4. Detective Juan Cloy of the FBI Violent Crimes Task Force discovered that the carpet lining was missing from the trunk of Harris’s car, which Cole regularly drove. Further investigation revealed traces of blood, and DNA testing confirmed it was a match for Norman.
*636 ¶5. When Cole appeared in the Pearl Municipal Court on November 29 to answer a domestic-violence charge stemming from the prior incident with Norman, he was arrested for murder and taken to the Jackson Police Department.
If 6. Upon questioning, Cole revealed the location of Norman’s body. It was quickly found in the area Cole described. Norman’s remains were in an advanced state of decomposition and were immediately transported to Dr. Stephen Hayne for an autopsy. At trial, Dr. Hayne testified that he found an injury on Norman’s chest that was “consistent with a stab wound.” The remains were also sent to Dr. Marie Dan-forth, a forensic anthropologist, for further analysis.
¶ 7. In a second interrogation, Cole confessed to killing Norman. According to Cole, after he picked Norman up from campus, they argued and it turned physical. During their struggle, he hit her in the head and knocked her unconscious. Cole claims he panicked and put her body in the trunk. After he drove around for several hours, he discovered she was not breathing and left her body in the woods.
PROCEDURAL HISTORY
¶ 8. Cole filed several pretrial motions that were denied by the trial judge, including a motion to allow possession of biological evidence, motions in limine to exclude various incidents and photos, a motion to suppress statements and physical evidence, and a motion for a change of venue. After holding a special venire and individual voir dire, the jury was sequestered and a trial ensued. Jury instructions were given for deliberate-design murder, but the defendant’s proposed manslaughter instruction was refused. Cole was convicted of Norman’s murder, and his motions for a judgment notwithstanding the verdict or for a new trial were denied.
¶ 9. Cole now appeals asserting the trial court erred by: (1) applying the wrong legal standard in refusing a jury instruction on manslaughter; (2) denying the motion for a change of venue; (3) refusing to quash or strike the venire; (4) denying challenges for cause as to specific jurors; (5) denying his motion to suppress statements and physical evidence; (6) denying his request for an independent forensic examination of the victim’s remains; (7) excluding the testimony of Dr. Danforth; (8) denying his motion in limine to exclude evidence of the Pearl arrest; (9) barring testimony of Norman’s prior acts; (10) admitting prejudicial evidence with no probative value; and (11) denying his motion in limine to exclude photos of the victim. Cole urges that these cumulative errors necessitate a new trial. Because we find the question of jury instructions disposi-tive, we do not reach Cole’s remaining issues. We address change of venue only to provide guidance on remand.
DISCUSSION
1. Change of Venue
f 10. Cole properly applied to the trial court for a change of venue pursuant to section 99-15-35 of Mississippi Code Annotated (Rev.2007) by presenting a sworn motion supported by two credible affidavits. A presumption of law then arose that an impartial jury could not be obtained in Hinds County, and the State was charged with the burden of rebutting that presumption. See Johnson v. State, 476 So.2d 1195, 1211 (Miss.1985). The Mississippi Supreme Court has listed “certain elements which, when present[,] would serve as an indicator to the trial court as to when the presumption is irrebuttable.” White v. State, 495 So.2d 1346, 1349 (Miss.1986). Those elements are:
*637 (1) Capital cases based on considerations of a heightened standard of review;
(2) Crowds threatening violence toward the accused;
(3) An inordinate amount of media coverage, particularly in cases of:
(a) serious crimes against influential families;
(b) serious crimes against public officials;
(c) serial crimes;
(d) crimes committed by a black defendant upon a white victim;
(e) where there is an inexperienced trial counsel.
Id. The State may rebut the presumption by proving through voir dire that the trial court did, in fact, impanel an impartial jury. Swann v. State, 806 So.2d 1111, 1116 (¶ 19) (Miss.2002). Then, the conviction will stand despite negative pretrial publicity. Johnson, 476 So.2d at 1211 (citing United States v. Harrelson, 754 F.2d 1153, 1159 (5th Cir.1985)).
¶ 11. Under the first element, this case is a “capital case” as defined by statute.[1] Accordingly, we apply a heightened standard of review. Addressing the second element, Cole asserts that “virtual crowds” threatened him with violence by posting anonymous comments on the internet. This Court does not see such internet postings as the modern equivalent of actual crowds physically threatening the accused with violence, so we move to the third indicator. Cole asserts that there has been an inordinate amount of media coverage of his case, making it impossible for him to receive a fair trial. However, there is no evidence that Norman was part of an influential family or held any public office. She was an undergraduate student from Greenville. Similarly, this was not a serial crime; both the victim and the accused are of the same race; and trial counsel was not inexperienced. Therefore, we agree with the trial court that while the presumption that an impartial jury could not be obtained was raised, it was not an irrebuttable presumption.
¶ 12. “The decision to grant a change of venue rests soundly in the discretion of the trial judge.” King v. State, 960 So.2d 413, 429 (¶ 25) (Miss.2007). This Court will not disturb the ruling of the trial court in denying a change of venue if its discretion was not abused. Howell v. State, 860 So.2d 704, 718 (¶ 30) (Miss.2003).
¶ 13. A review of recent case law shows that negative pretrial publicity alone is not enough to show an abuse of discretion in the denial of a change of venue where the trial judge conducts individual voir dire and ensures all selected jurors assert their ability to remain impartial. See Barfield v. State, 22 So.3d 1175, 1184 (¶ 29) (Miss.2009); Byrom v. State, 927 So.2d 709, 716 (¶¶ 13-15) (Miss.2006); Howell v. State, 860 So.2d 704, 720 (¶ 37) (Miss.2003); Swann v. State, 806 So.2d 1111, 1116 (¶¶ 19-21) (Miss.2002).
¶ 14. Cole urges this Court to apply the ruling in Fisher v. State, 481 So.2d 203 (Miss.1985), and reverse the denial of a change of venue. There, the supreme court pointed out that its main concern was the “saturation media coverage” that generated a sense of community fear and disclosed damning facts that would be inadmissible at trial. Id. at 217. It was not only the quantity of coverage, which was *638 substantial, but the quality of coverage that necessitated a change of venue. Because the defendant was repeatedly linked to other murders and his prior convictions were disclosed, he could not receive a fair trial in that county.
¶ 15. In Harris v. State, 537 So.2d 1325, 1328-29 (Miss.1989), the trial court’s denial of a change of venue was affirmed where fifty-two of eighty-two venire members had knowledge of the case. Saturation media coverage was urged as a ground for reversal, but the supreme court held that the facts before it were not comparable to Fisher because the saturation coverage in Fisher linked the defendant to other crimes and inadmissible evidence. Id. at 1328.
¶ 16. More recently, in Welde v. State, 3 So.3d 113, 119 (¶¶ 28-29) (Miss.2009), the supreme court held that there was no abuse of discretion in denying a change of venue even though numerous venire members had seen news coverage of the case. The only venire member to state he had formed an opinion was stricken, and any member with knowledge of the case was given an individual voir dire. Id. at (¶ 26). All who remained as potential jurors affirmed their impartiality. Id. at (¶ 28). Further, the trial court gave careful instructions and sequestered the jury. Id. at (¶¶ 27-29).
¶ 17. Here, Cole argues that the quantity of media coverage his case received required a change of venue. Seventy-seven venire members declared they had knowledge of his case through media coverage, and several newspaper articles[2] covered his prosecution.
¶ 18. While it is clear that Cole’s case received much pretrial publicity, that alone is not enough to require a change of venue. There was very little showing that any inadmissible evidence was released in the press.[3] The testimony at the motion hearing, from all witnesses, was that Cole had not recently been in the news at the time of trial. After Norman’s body was discovered, the media coverage was greatly reduced, and the trial did not occur until over a year later.
¶ 19. More importantly, individual voir dire examination was conducted of all eighty-four venire members, and those twelve who could not set aside pre-formed opinions were excused. The prospective jurors who remained stated under oath that they could be impartial. Once the jury was selected, the trial judge gave clear instructions and sequestered the jury. A heightened level of precaution was taken to ensure Cole received a fair trial. After reviewing the record, we find that an impartial jury was, in fact, impaneled, and that the trial judge did not abuse his discretion in denying a change of venue. While this is a fact-specific inquiry, we note for purposes of remand that an impartial jury can be obtained in Hinds County if the proper procedures are followed.
2. Jury Instructions
¶ 20. Cole asserts that the trial judge erred in refusing his manslaughter instruc *639 tion and that it was fatally prejudicial to his defense.
 ¶ 21. A criminal defendant is entitled to a jury instruction that presents “his theory of the case even when ‘the evidence that supports it is weak, inconsistent, or of doubtful credibility.’ ” Banyard v. State, 47 So.3d 676, 682 (¶ 17) (Miss.2010) (quoting Ellis v. State, 778 So.2d 114, 118 (¶ 15) (Miss.2000)). “ ‘[Wjhere the defendant’s proffered instruction has an evi-dentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error.’ ” Chinn v. State, 958 So.2d 1223, 1225 (¶ 13) (Miss.2007) (quoting Phillipson v. State, 943 So.2d 670, 671-72 (¶ 6) (Miss.2006)).
¶ 22. However, this entitlement is limited. The court may refuse a lesser-ineluded-offense instruction if — taking the evidence in the light most favorable to the accused, considering all reasonable inferences in his favor, and considering the jury may not be required to believe any evidence offered by the State — no hypothetical reasonable jury could convict the defendant of the lesser offense. Fairchild v. State, 459 So.2d 793, 801 (Miss.1984) (citing Ruffin v. State, 444 So.2d 839, 840 (Miss.1984)).
¶ 23. “In deciding whether lesser[-]ineluded instructions are to be given, trial courts must be mindful of the disparity in maximum punishments.” Boyd v. State, 557 So.2d 1178, 1181 (Miss.1989). Where the question is close, “the doubt should be resolved in favor of the accused.” Brown v. State, 39 So.3d 890, 900 (¶ 37) (Miss.2010) (quoting Davis v. State, 18 So.3d 842, 847 (¶ 15) (Miss.2009)).
¶ 24. First, we must determine if the proposed instruction properly stated the law. Cole’s proposed instruction, D-9, stated: “Manslaughter is defined as the killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.” This language tracks section 97-3-35 of the Mississippi Code Annotated (Rev.2006) and is, therefore, a proper statement of the law.
¶ 25. Second, we examine whether the given instructions cover the defendant’s theory of the case. We must consider not only the refused instruction but all of the court’s instructions to determine if there was error in its refusal. Robinson v. State, 40 So.3d 570, 575-76 (¶ 21) (Miss.Ct.App.2009). The jury was given fourteen instructions ranging from its duty to apply the law, to selecting a foreman, to the form of the verdict. However, it was only instructed on one crime, murder. The crime of manslaughter, a lesser-included offense of murder, does not appear in the given jury instructions. In fact, the record reveals that the jury submitted a question to the trial judge asking for the definition of manslaughter. The judge replied, “Manslaughter is not an issue in this case.” It is apparent that no jury instruction was issued on Cole’s theory of the case.
1126. Finally, we look to whether there was a sufficient foundation in the evidence for the requested instruction. In considering the lesser-included offense of manslaughter, we must determine if, taking the evidence in the light most favorable to Cole, no hypothetical reasonable jury could convict him of the lesser offense. Certainly, Cole’s confession supports his manslaughter theory. He stated:
We just kept arguing and kept fighting[,] and uh, one thing just led to another. We was just fighting[,] and just cussing and just, just really just got out of hand[,] and before I knew it[,] I hit her too hard and knocked her out and just panicked and wasn’t thinking *640 straight, scared. I didn’t know if she was still alive at that moment or what[,] but I just panicked and just put her in the trunk .... we was just fighting all over ... she was fighting back, I was fighting back ... we was just going crazy.
¶27. The physical evidence could also support Cole’s theory of the case. No weapon was ever found, and the injury identified by Dr. Hayne was only “consistent with” a stab wound. Dr. Hayne never testified to a reasonable degree of medical certainty as to the cause of death. He could not exclude a head injury as the cause of death, and when asked, he responded: “I didn’t see that, counselor. Of course, a lot of the soft tissue was gone. It was skeletal, so I would not see a soft tissue injury.” This created a question of fact as to the cause of Norman’s death. The photographic evidence presented shows a small dark hole in Norman’s flesh that is covered in grass, dirt, and leaves. The jury could have concluded this injury was inflicted after Norman’s death when she was left in the woods. Further, Dr. Danforth testified to evidence of trauma on Norman’s skull and described a reddish patch over Norman’s left eye the size of a silver dollar.
¶28. The jury was concerned about manslaughter and specifically asked for guidance on that point. “In a criminal prosecution, trial and appellate judges do not always find the defendant’s testimony believable, credible, or consistent with other evidence. Still, it is evidence .... [and] juries, not judges, determine the weight and credibility of the evidence....” Flowers v. State, 51 So.3d 911, 913 (¶ 9) (Miss. 2010). Had the jurors believed Cole’s statement, they could not have applied those facts to the law because the trial judge provided them no instruction on the law of manslaughter. See id. at (¶ 10).
¶ 29. The State argues the trial judge properly refused the requested instruction because adequate provocation for a heat-of-passion-manslaughter instruction was not shown. Heat of passion has been defined as:
a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time.
Underwood v. State, 708 So.2d 18, 36 (¶ 54) (Miss.1998) (quoting Tait v. State, 669 So.2d 85, 89 (Miss.1996)). It is well established that words alone are not enough to require a heat-of-passion instruction. Myers v. State, 832 So.2d 540, 542 (¶ 10) (Miss.Ct.App.2002). Cole testified that he and Norman were fighting and that things got out of hand. The two also had some history of a violent relationship. Specifically, Cole stated: “[S]he was fighting back, I was fighting back ... we was just going crazy.” A reasonable jury could have believed this version of events and found the fight Cole described to be adequate provocation. See Bolton v. State, 87 So.3d 1129, 1133-34 (¶¶ 14-15) (Miss.Ct.App.2012). Taking the evidence in the light most favorable to the accused, considering all reasonable inferences in his favor, and considering the jury may not be required to believe any evidence offered by the State, we find that a reasonable hypothetical jury could have convicted Cole of manslaughter. It is the jury’s function to determine the weight and credibility of evidence.
¶ 30. The dissent makes much of Dr. Hayne’s medical testimony, but its reliance is problematic. Specifically, when Dr. Hayne was asked about seeing evidence of a head injury, he replied: “I didn’t see *641 that, Counselor. Of course, a lot of the soft tissue was gone. It was skeletal, so I would not see a soft tissue injury.” The dissent converts this statement into it being “medically impossible” for Norman to have died from a head injury. But more interesting, Dr. Hayne apparently did not notice the reddish silver-dollar-sized patch on Norman’s skull, which according to Dr. Danforth evidences trauma. Further, at no point did Dr. Hayne ever state to a reasonable medical certainty that the cause of Norman’s death was a stabbing. He could not make that statement; he could only say that her injury was consistent with a stab wound. In any event, the jury was entitled to disbelieve any and all of Dr. Hayne’s testimony.
¶ 31. Cole told police that he and Norman were going crazy, fighting with each other, and that she was fighting back. The evidence of provocation is admittedly weak, but it exists. The manslaughter instruction should have been granted because all that was necessary for the jury to convict Cole of manslaughter was that it be unconvinced by a part of the State’s proof, specifically Dr. Hayne’s testimony. See Fairchild, 459 So.2d at 801-02. Cole was entitled to have his theory of the case submitted to a properly instructed jury. See Chinn, 958 So.2d at 1226 (¶ 18). Because the trial court failed to properly instruct the jury on the law of manslaughter, we must reverse Cole’s conviction and remand this case for a new trial. As we find this issue dispositive, we do not reach Cole’s remaining nine issues.
1132. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS REVERSED, AND THIS CASE IS REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
LEE, C.J., GRIFFIS, P.J., ISHEE, ROBERTS, MAXWELL AND RUSSELL, JJ„ CONCUR. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, J.; BARNES, J., JOINS IN PART.

. "Capital case, when used in any statute shall denote criminal cases, offenses and crimes punishable by death or imprisonment for life in the state penitentiary." Harrison v. State, 49 So.3d 80, 84 (¶ 11) (Miss.2010) (quoting Miss. Code Ann. § 1-3-4 (Rev.2005)) (emphasis added).

. Cole's brief asserts that there were “some 400 newspaper stories” covering Norman’s murder and his prosecution. The State counts thirty Clarion-Ledger articles that centered on the story and asserts that the defense has inflated its numbers by including every article that so much as mentions either Norman or Cole.

. There was a news story the night before voir dire that stated Cole hoped to make a plea deal but was turned down by the prosecution. It is undisputed that this information was factually incorrect. However, prior to the broadcast, the court instructed all potential jurors to refrain from watching any media, and individual voir dire was subsequently conducted on the media-exposure issue.