# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00332-COA

GARY WAYNE WALLACE                                          APPELLANT

v.

STATE OF MISSISSIPPI                                         APPELLEE

DATE OF JUDGMENT:            03/10/2022
TRIAL JUDGE:                 HON. CHRISTOPHER LOUIS SCHMIDT
COURT FROM WHICH APPEALED:   HARRISON COUNTY CIRCUIT COURT,
                             SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:           WILLIAM CROSBY PARKER
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 06/13/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., GREENLEE AND McDONALD, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Gary Wayne Wallace was convicted of first-degree murder following a jury trial. On appeal, Wallace argues that the trial court erred (1) by denying his request for a heat-of-passion manslaughter instruction and (2) by allowing testimony related to injuries the victim suffered a week before her death. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Penny Clark and Wallace had been dating for about six months and lived together. On May 20, 2019, at 11:43 p.m., Wallace called 911 and reported that he had returned home from a trip to the store to find Clark dead. Officers Robert Dronet and Shane Grimmett of

the Biloxi Police Department responded to Wallace and Clark's apartment. Dronet testified that the bottom-floor apartment was unusually dark when they arrived. The porch lights were turned off, and no interior lights could be seen through the front windows. When Dronet knocked and announced himself, Wallace unlocked the door and directed the officers to the apartment's back bedroom. Clark was on the bedroom floor wearing only a blood-soaked gray shirt pulled up to her neck.[1] Her face was injured, and she was bleeding from her nose and mouth. The sheets were bloody, and blood was spattered on the walls.

¶3.     Paramedics arrived and treated Clark for about forty-five minutes, but she did not respond and was later pronounced dead at the hospital. While the paramedics tried to revive Clark, the officers took Wallace outside and tried to gather more details about what had occurred. Photographs taken at the police department showed that Wallace had blood spatter on his left arm, an open cut below a knuckle on his right hand, and red marks on his right shoulder. Dronet also noted that Wallace had scratches on his back.

¶4.     Dronet was wearing a body camera, and the video of his encounter with Wallace was admitted into evidence at trial. Wallace told the officers that he had left the apartment to buy more beer from a nearby store, but he changed his mind and walked back home. He said that when he returned to the apartment, he found Clark bleeding on the bedroom floor. Wallace told the officers that he waited approximately one hour before calling 911. Wallace said he fell and cut his finger while attempting to make the call. He stated that he tried to revive Clark by performing mouth-to-mouth resuscitation. Dronet asked Wallace why Clark had

---

[1] A red t-shirt covered in blood was later found beneath folded clothing in a clothes hamper in a closet. Clark had been wearing the red t-shirt earlier in the day.

a black eye, and Wallace said the injury was the result of a fall at the Hard Rock Casino about two weeks earlier. Wallace appears intoxicated in the video, and as discussed below, the evidence at trial indicated that he had donated blood plasma earlier in the day and then consumed several beers.

¶5. While Dronet was assessing the scene, he saw a knife on the bathroom sink. Paramedics advised Dronet that they found a small pocketknife on the floor underneath Clark's body. There were no signs of forced entry to the apartment.

¶6. Wallace's sister, Jamie Ratcliff, testified at trial that she visited with Wallace and Clark on the night of Clark's death. Ratcliff had tried to visit them earlier in the day, but Wallace and Clark had gone to Gulfport to donate blood plasma. Around 8:30 p.m., Ratcliff went to Wallace and Clark's apartment to drop off some laundry she had washed for them. Clark was cooking dinner, and Wallace asked Ratcliff to show Clark how to bake chicken in the oven because Clark only knew how to boil it. Wallace also asked Clark to take them to a nearby convenience store, and she agreed. Video surveillance footage from the store shows that Wallace and Clark entered the store at 9:11 p.m., and Wallace bought a beer. Wallace had already visited the store twice that evening—at 6:12 p.m., he bought two beers and some cigarettes, and at 7:37 p.m., he returned and bought another beer.

¶7. Ratcliff took Wallace and Clark back to their apartment and told Clark how to bake the chicken. Ratcliff called Wallace later, but Wallace did not answer. Wallace eventually called her back at 10:16 p.m., and Ratcliff asked him if he and Clark had eaten yet. Wallace said they had not because they had been having sex in the shower. Ratcliff testified that she

3

thought she heard Clark tell Wallace she loved him.

¶8.    Ratcliff also testified that about one week before Clark was murdered, she observed bruises on Clark's face. Ratcliff testified that Clark's "face was black and blue" and that "her ribs were messed up." When Ratcliff asked Clark what happened, Wallace and Clark both said that Clark had fallen in front of the Hard Rock Casino. Clark asked Ratcliff to take her to the hospital because she felt like she was about to have a seizure.[2] Ratcliff was about to take Clark to the hospital, but Wallace "got agitated" and would not allow them to leave the apartment. Ratcliff testified that when Clark again asked to go to the hospital, Wallace "got mad" and "tried to put his hands on [Clark]." Ratcliff "tried to intervene," but Wallace "got [Clark] in a headlock." Ratcliff "finally got [Clark] away from [Wallace]," but then Wallace "threw [Ratcliff] around" too. Ratcliff testified that she "had to beat [Wallace] in the chest" and begged him to stop, but Wallace kept going after Clark. Ratcliff testified that she "finally got [Wallace] to calm down" and then stayed in the apartment "for probably an hour or two" to make sure there were no more problems. Wallace never left Ratcliff alone with Clark the entire time she was at their apartment that day.

¶9.    A postmortem analysis of Clark's fingernail clippings revealed a mixture of two individuals' DNA. The mixture contained a dominant profile consistent with Clark's DNA, but there was insufficient information to determine whether Wallace's DNA was present on the fingernails. The bloody gray t-shirt Clark was wearing at the time of her death contained a dominant profile consistent with Wallace's DNA. The bloody red t-shirt Clark had worn

---

[2] Ratcliff testified that Clark may have taken medication for epilepsy or schizophrenia, but no other evidence was offered on this point.

4

was found in the clothes hamper and contained DNA consistent with Clark's DNA.

¶10.    Dr. Mark LeVaughn, the pathologist who performed Clark's autopsy, testified that Clark suffered multiple blunt injuries to her face.  Blows to Clark's face had knocked out some of her teeth.  Clark also had two black eyes, a laceration on her forehead, and an abrasion and laceration on her ear.  Clark had also suffered "strangulation-type" injuries and defensive injuries.  The autopsy also revealed bleeding on Clark's brain and internal injuries to the muscles around her voice box.  Dr. LeVaughn concluded that Clark was "beaten and strangled."

¶11.    Wallace was indicted for first-degree murder, and the case proceeded to a jury trial. After the State rested its case-in-chief, Wallace rested without testifying or calling any witnesses.  The jury was instructed on the indicted offense and the lesser-included offense of second-degree murder.  The jury found Wallace guilty of first-degree murder, and the court sentenced him to life imprisonment, as required by law.

## ANALYSIS

¶12.    On appeal, Wallace argues that the trial court erred by (1) refusing a heat-of-passion manslaughter jury instruction and (2) allowing Ratcliff to testify about Clark's injuries and Wallace's conduct one week before the murder.  We address these issues in turn.

### I.    Heat-of-Passion Manslaughter Instruction

¶13.    Here, we review de novo the refusal of lesser-included-offense instructions, "as this is a question of law." *Downs v. State*, 962 So. 2d 1255, 1258 (¶10) (Miss. 2007).  "A defendant has a right to a lesser-included-offense instruction if there is some evidence from

5

which a reasonable juror could find him *both* not guilty of the indicted offense *and* guilty of the lesser-included offense." *Curtis v. State*, 298 So. 3d 446, 451 (¶11) (Miss. Ct. App. 2020) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)), *cert. denied*, 316 So. 3d 202 (Miss. 2021). But "lesser-included-offense instructions should not be indiscriminately granted; instead, the jury should not be presented with a lesser-included-offense instruction unless the record provides an evidentiary basis for the instruction." *Franklin v. State*, 136 So. 3d 1021, 1026 (¶11) (Miss. 2014) (quotation marks omitted). "Additionally, lesser-included-offense instructions should not be granted on mere speculation." *Id.*

¶14. "A homicide can be reduced from murder to manslaughter if committed when in the heat of passion." *Hines v. State*, 749 So. 2d 232, 233 (¶3) (Miss. Ct. App. 1999); *see* Miss. Code Ann. § 97-3-35 (Rev. 2020). The Mississippi Supreme Court has defined "heat of passion" as follows:

> A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from a grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010) (quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)). In addition, the Court has stated:

> One of the primary elements of a heat-of-passion crime is immediate and reasonable provocation, by words or acts of one at the time. . . . [I]t is essential that the excited and angry condition of the party committing the act which would entitle him to the milder consideration of the law, should be superinduced by some insult, provocation, or injury, which would naturally

6

and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation. . . . [T]here must not only be passion and anger to reduce a crime to manslaughter, but there must be such circumstances as would indicate that a normal mind would be roused to the extent that the reason is overthrown and that passion usurps the mind destroying judgment.

*Id.* at 866-67 (¶36) (citation and quotation marks omitted). Furthermore, "[t]he mere fact that [the defendant] and [the victim] were arguing before the [killing] is insufficient to reduce the crime to manslaughter." *Avera v. State*, 761 So. 2d 900, 903 (¶10) (Miss. Ct. App. 2000). "Words of reproach, criticism or anger do not constitute sufficient provocation to reduce an intentional and unjustifiable homicide from murder to manslaughter." *Gaddis v. State*, 207 Miss. 508, 515-16, 42 So. 2d 724, 726 (1949).

¶15. In the present case, we agree with the trial court that there was not "even a scintilla of evidence" that Clark provoked Wallace or that he acted in the heat of passion. Wallace does not point to any evidence of any provocation, let alone a provocation sufficient to reduce this homicide to manslaughter. Wallace simply speculates that "something happened" between the time he and Clark had sex in the shower and her subsequent murder. But "lesser-included-offense instructions should not be granted on mere speculation." *Franklin*, 136 So. 3d at 1026 (¶11). Because the record contains no evidence of any provocation or "heat of passion," the trial court properly refused Wallace's instruction.[3]

## II. Ratcliff's Testimony

¶16. Prior to trial, Wallace filed a motion in limine to preclude Ratcliff from testifying

---

[3] On appeal, Wallace relies on *Cole v. State*, 118 So. 3d 633 (Miss. Ct. App. 2012), but in *Cole*, the defendant's statement to police provided evidence of a heated fight and sufficient provocation. *Id.* at 639-41 (¶¶26-31). Such evidence is wholly lacking here, where Wallace insisted to the police that he simply came home and found Clark dead.

"regarding injuries . . . Clark allegedly received prior to the date in question." Wallace argued that Ratcliff's testimony should be excluded because it was "not only irrelevant, but its probative value [was] substantially outweighed by the danger of unfair prejudice under [Mississippi Rule of Evidence] 403." At a pretrial hearing, the State argued that Ratcliff's testimony was relevant to explain Clark's black eye, which the jury would see in the video of Clark and Wallace at the convenience store shortly before her death. The State also argued that the testimony was relevant because the jury would hear Wallace's statement to Officer Dronet that Clark's black eye was the result of a fall a week earlier at the Hard Rock Casino. In addition, the State argued that Dr. LeVaughn would discuss both new and old injuries that he observed during Clark's autopsy. Finally, the State argued that the testimony "showed [Wallace's] opportunity, intent, and absence of mistake," citing *Clark v. State*, 122 So. 3d 129 (Miss. Ct. App. 2013). Prior to trial, the court denied Wallace's motion in limine, ruling that Ratcliff's testimony regarding the black eye and the incident the week before was relevant to show Wallace's "motive, intent, and/or lack of mistake." In addition, the court ruled that the evidence's "probative value [was] not substantially outweighed by the danger of unfair prejudice." At trial, Ratcliff testified as described above. *See supra* ¶8.

¶17. "We review a circuit court's decision to admit or exclude evidence pursuant to our familiar abuse of discretion standard." *Fugate v.* State, 951 So. 2d 604, 610 (¶25) (Miss. Ct. App. 2007). "We will find an abuse of discretion where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense." *Id.* But "[w]e will not disturb the circuit court's decision unless it is clearly

8

wrong." *Id.* As our Supreme Court has stated, the "trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." *Bowman v. State*, 283 So. 3d 154, 164 (¶37) (Miss. 2019) (quoting *Hargett v. State*, 62 So. 3d 950, 952 (¶7) (Miss. 2011)).

¶18.    Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1). However, such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). Such evidence may be admissible for other purposes as well—the examples listed in the rule "are not exclusive." *Id.* advisory committee note. Evidence offered for a valid, non-character purpose "is properly admissible if it passes muster under [Rule] 403 and is accompanied by a proper limiting instruction." *Fairley v. State*, 275 So. 3d 1012, 1019 (¶30) (Miss. 2019) (quoting *Swington v. State*, 742 So. 2d 1106, 1112 (¶15) (Miss. 1999)).

¶19.    Furthermore, relevant evidence should not be excluded under Rule 403 unless its "probative value is *substantially outweighed* by the danger of unfair prejudice." MRE 403 (emphasis added). "Even then, exclusion is permissive, not mandatory. That decision is committed to the broad discretion of the trial judge, and our standard of review is highly deferential." *Curry v. State*, 202 So. 3d 294, 298-99 (¶13) (Miss. Ct. App. 2016) (ellipsis omitted). "Rule 403's scope is narrow, [and] it is an extraordinary measure that should be used very sparingly." *Id.* at 298 (¶13) (quotation marks omitted).

¶20.    The trial court in this case did not abuse its discretion by denying Wallace's motion

in limine. The jury was able to see Clark's black eye in the video of her at the convenience store prior to her death, and the jury heard Wallace's statement to Dronet that the black eye was the result of an alleged fall at a casino. The State was not required to leave the jury with only Wallace's explanation of the injury. Rather, the State was entitled to offer Ratcliff's testimony, which raised an inference that Wallace had given Clark the black eye and then prevented her from seeking medical attention. As our Supreme Court has stated, evidence of other acts is "admissible in order to tell the complete story so as not to confuse the jury." *Palmer v. State*, 939 So. 2d 792, 795 (¶9) (Miss. 2006). "[T]he State has a legitimate interest in telling a rational and coherent story of what happened . . . ." *Bowman*, 283 So. 3d at 165 n.8. "When substantially necessary to present to the jury the complete story of the crime, evidence or testimony may be given even though it may reveal or suggest other crimes." *Id.* Here, Ratcliff's testimony about the incident a week before Clark's death was admissible to explain Clark's injuries and Wallace's statement to Dronet.

¶21. In addition, in domestic violence cases, this Court has held that evidence of other violent incidents may be admissible to "show the escalating level of violence, culminating in [the subject offense]." *Marbra v. State*, 904 So. 2d 1169, 1175 (¶21) (Miss. Ct. App. 2004); *accord Moss v. State*, 727 So. 2d 720, 725 (¶19) (Miss. Ct. App. 1998). In such cases, testimony regarding prior acts of violence is admissible "not . . . to prove the character of" the defendant but rather to show "a continuing pattern of violence against the victim [that] resulted in her death." *Moss*, 727 So. 2d at 725 (¶19). Such evidence is relevant and admissible under Rule 404(b) to show the defendant's "motive and intent." *Id.*

10

¶22. Here, Wallace's statement to Dronet attempted to portray a loving relationship between him and Clark. The State was entitled to offer Ratcliff's contrary testimony, which suggested that Wallace had a history of violence against Clark that apparently escalated and culminated on the night of her murder. It is true, as Wallace argues, that there is no direct evidence that Wallace caused Clark's prior injuries. However, Ratcliff's testimony that Wallace adamantly and even violently opposed Clark's pleas to go to the hospital is credible circumstantial evidence that Wallace had assaulted Clark previously. As such, it is evidence of an escalating "pattern of violence against the victim" and was admissible to show Wallace's "motive and intent." *Id.* We cannot say that the trial court abused its discretion by admitting it for that additional purpose.

¶23. In addition, the trial court properly considered and rejected Wallace's argument that the danger of unfair prejudice "substantially outweighed" the probative value of Ratcliff's testimony. MRE 403. Finally, the trial court gave the limiting instruction that Wallace requested at trial, instructing the jury that it could not simply infer that Wallace was guilty based on his previous acts. Accordingly, we conclude that the trial court fully complied with Rule 403 and Rule 404(b) and did not abuse its discretion.

## CONCLUSION

¶24. The trial court properly refused the heat-of-passion manslaughter instruction and did not abuse its discretion by admitting Ratcliff's testimony related to Clark's prior injuries.

¶25. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. SMITH, J., NOT**

11

**PARTICIPATING.**